(No. 56137.—

JACK T. KNUEPFER, County Board Chairman, Plaintiff, v. BRUCE R. FAWELL, Judge, Defendant.

*Opinion filed January 24, 1983.*

J. Michael Fitzsimmons, State's Attorney (George J. Sotos, John A. Davidovich, Roy F. Lawrence, Barbara A. Preiner, and Keith Letsche, Assistant State's Attorneys, of counsel), for plaintiff.

Edward J. Walsh, Jr., of Huck & Walsh, Chartered, of Wheaton, and Stephen J. Culliton, of Civinelli, Bakalis and Culliton, of Bloomingdale, for defendant.

Botti, Marinaccio, Wilkinson, and Maksym, Ltd., of Oak Brook (Aldo E. Botti and Walter P. Maksym, Jr., of counsel), for *amicus curiae* Urban Counties Council of Illinois.

JUSTICE UNDERWOOD delivered the opinion of the court:

This case involves the question as to the circumstances in which the judicial branch of government may properly order production of facilities for its use when the legislative or executive agency primarily responsible for doing so has failed to act. We granted Jack T. Knuepfer, chairman of the Du Page County Board, leave to file this original action seeking a writ of *mandamus* or a supervisory order directing vacation of an administrative order entered by defendant, Chief Judge Bruce R. Fawell of the 18th judicial circuit. That order, entered on January 29, 1982, commanded the Du Page County Board to evict a private business tenant operating a cafeteria in the county administration building and to remodel the resulting space into five courtrooms. The county board was additionally required to make available certain other rooms to accommodate staff personnel. Plaintiff's emergency motion to stay defendant's administrative order was allowed, and the Urban Counties Council of Illinois was granted leave to file a brief as *amicus curiae.*

Because of the extraordinary nature of this action, the importance of the underlying issue, and its potential impact upon the delicate relationships between the several departments of local government, this court took the unusual step of authorizing pretrial conferences by its resident member with the parties to this cause in a manner similar to that provided for the appellate court by our Rule 310 (87 Ill. 2d R. 310.) The failure to reach agreement after numerous conferences necessitates our resolving the issue.

This regrettable dispute followed approximately two years of combined legislative and judicial efforts at the local level to formulate a suitable plan to meet the increasing judicial need for space in Du Page County. That county, which constitutes the entire 18th judicial circuit, is one in which there has been rapid population growth in recent years resulting in a substantial increase in the number of judges. The existing judicial facilities are primarily located in the old courthouse and courthouse annex, with two additional courtrooms located in the north wing of the newer county administration building, known as Du Page Center. The record indicates that in September 1979 defendant contacted the Judiciary and Law Enforcement Committee, the Finance Committee, and the Building and Grounds Committee of the Du Page County Board. He informed them that an anticipated addition of three or four judges in 1981 would result in a need for additional court facilities and requested an appropriation of funds for that purpose.

In November 1979 the Judiciary and Law Enforcement Committee formed the User's Committee for Space Planning, which explored both short-term and long-term plans for expanding the judicial facilities before presenting a proposal to the Judicial and Law Enforcement Committee on May 19, 1980. During this period, representatives of the court reminded county board members that additional judgeships were planned for the early part of 1981. The User's Committee suggested that a third floor be constructed above the cafeteria in the north wing of Du Page Center to house new courtrooms and chambers. This addition would have provided the court with 8,100 square feet of additional space. The proposal and budgetary considerations were examined by various county board committees and judicial representatives until a final construction plan was adopted on April 22, 1981. The State's Attorney's office was then autho-

rized to negotiate and finalize the necessary contracts.

The anticipated four additional judges joined the court in June 1981. When the construction contracts were still unexecuted at the end of September 1981 defendant notified the Building Administration Committee chairman that the judiciary would intervene if additional facilities were not provided by March 1, 1982. At the end of October 1981 the court was informed that the planned addition would have to be postponed and possibly cancelled due to a recently discovered structural problem in the north wing. The Building Committee then met four times in November 1981 to discuss alternate proposals to expand the judicial facilities. Because the construction plans were suitable for use in remodeling the cafeteria or the space underneath it occupied by the local election commission, the Building Administration Committee decided in December 1981 to terminate the lease held by the Du Page County board of election commissioners. The election commission was given until the end of April to vacate the premises in order to minimize any disruption of the March 1982 primary elections.

On January 4, 1982, defendant conducted an administrative hearing in order to determine the needs of the judiciary and what action should be taken to meet those needs. Testimony was heard from the court administrator, three circuit court judges, a legal assistant, and the executive director of the election commission. Although members of the county board were present and invited to testify, they declined to do so. The executive director testified that the election commission's lease had been terminated and that relocation to other space within Du Page Center would not provide the commission with sufficient space.

Testimony heard from the other witnesses indicated that the existing judicial facilities were inadequate in that the lack of space impaired the court's ability to

function in a dignified and efficient manner, particularly after the additional judges joined the court the preceding June. The four new judges were able to use vacationing judges' chambers and courtrooms during the summer of 1981. When all of the judges returned, however, the new judges were forced to search for unused courtrooms before convening each of their sessions because only 24 courtrooms were available for the 28 judges assigned to hear cases. Proceedings initiated in one courtroom frequently had to be finished in another courtroom, and this constant shuffling of courtrooms created confusion to the extent that parties and witnesses often failed to appear because they were waiting in a different courtroom. Moreover, cases assigned to these judges were frequently delayed. One of the judges attempted to hold proceedings in his chamber, but discarded the practice when it became obvious that the cramped quarters increased the animosity between the parties and impaired the court's ability to function with decorum. Another new judge was not even assigned chambers.

Following the administrative hearing, defendant entered an order commanding the county board to supply the court with a plan providing a minimum of 8,100 square feet of additional space; the deadline for submitting the plan was January 15, 1982. The order also required the plan to be capable of completion on or before March 1, 1982. Defendant stated in his order that he would seize 8,100 square feet in Du Page Center if the county board failed to comply. The county board held its own hearing on January 14, 1982, and on January 15, 1982, defendant and plaintiff apparently reached a tentative agreement on a plan to provide the court with temporary additional facilities until the election commission's space could be remodeled. The record does not indicate why this agreement collapsed, but on January 29, 1982, defendant entered his administrative order commanding

the county board to surrender the cafeteria at Du Page Center by February 2, 1982. The county board subsequently rescinded its termination of the election commission's lease.

Defendant initially urges this court to find that plaintiff lacks standing because the county board had not passed a resolution authorizing plaintiff to act upon its behalf when he instituted this action. It is unnecessary to decide whether plaintiff had contemporaneous authority in the absence of a prior resolution because the county board subsequently adopted a resolution expressly providing retroactive authority, and ratifying and confirming plaintiff's actions. Plaintiff's action had obviously been undertaken on behalf of the county board, and it is well established that an informed ratification is equivalent to an original authorization. (*Vetesnik v. Magull* (1932), 347 Ill. 611, 617; *Neenan v. Industrial Com.* (1928), 329 Ill. 48, 56-57. See also *Bragg v. Fessenden* (1850), 11 Ill. 544.) Furthermore, while this court continues to regard *mandamus* as an extraordinary remedy, we may consider a petition for the writ when it presents, as is true here, an issue which is both novel and of crucial importance to the administration of justice; in such cases, all of the normal requirements for *mandamus* need not be present initially. See, *e.g., People ex rel. Bier v. Scholz* (1979), 77 Ill. 2d 12, 16; *People ex rel. Carey v. Covelli* (1976), 61 Ill. 2d 394, 400-01; *People ex rel. General Motors Corp. v. Bua* (1967), 37 Ill. 2d 180, 192.

The crucial issue before us, however, is found in plaintiff's argument, joined by *amicus*, that defendant's order exceeded the scope of his authority. Contending that the judiciary's inherent power is applicable only to regulate facilities already existing, respondent's order is characterized as an impermissible intrusion into the legislative domain. That argument is bottomed upon the

separation-of-powers provisions incorporated in article II, section 1, of our 1970 constitution:

"The legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another."

The import of this language is the same as that of its predecessors in our earlier constitutions (*City of Waukegan v. Pollution Control Board* (1974), 57 Ill. 2d 170, 173) and is "that the whole power of two or more of these departments shall not be lodged in the same hands, whether of one or many." (*Field v. People ex rel. McClernand* (1839), 3 Ill. (2 Scam.) 79, 84, quoted approvingly in *City of Waukegan v. Pollution Control Board* (1974), 57 Ill. 2d 170, 174.) The separation-of-powers doctrine was not designed, however, to achieve a complete divorce between the three departments (*City of Waukegan v. Pollution Control Board* (1974), 57 Ill. 2d 170, 174; *People v. Reiner* (1955), 6 Ill. 2d 337, 342.) It is abundantly clear from our opinion in *City of Waukegan* that there exists no constitutional prohibition forbidding every exercise of functions by one branch of government which conventionally are exercised by another. We there held, in accord with what we considered the modern trend, that administrative agencies could impose discretionary civil penalties such as the monetary fines there imposed by the agency.

More to the point in the case before us is our discussion in *People ex rel. Bier v. Scholz* (1979), 77 Ill. 2d 12. We there issued a writ of *mandamus* directing that an administrative order of the respondent chief judge be vacated. That order had fixed probation officer salaries at levels above those approved by the county board, in which respondent agreed the legislature had vested the salary-setting authority. While we held the administrative order improper, we reached that conclusion only because the salaries as set by the board did not appear to be unreasonable (77 Ill. 2d 12, 18), and our discussion of the issue

leaves no basis to doubt the inherent power of the courts to protect themselves and require production of the facilities, personnel and resources reasonably necessary "to enable them to perform their judicial functions with efficiency, independence and dignity." (77 Ill. 2d 12, 19); see also *People ex rel. Illinois State Bar Association v. Peoples Stock Yards State Bank* (1931), 344 Ill. 462, 470. Accord, *State ex rel. Lorig v. Board of Commissioners* (1977), 52 Ohio St. 2d 70, 369 N.E.2d 1046; *Zylstra v. Piva* (1975), 85 Wash. 2d 743, 539 P.2d 823; *O'Coin's, Inc. v. Treasurer of County of Worcester* (1972), 362 Mass. 507, 287 N.E.2d 608; *Judges for Third Judicial Circuit v. County of Wayne* (1971), 386 Mich. 1, 190 N.W.2d 228; *Commonwealth ex rel. Carroll v. Tate* (1971), 442 Pa. 45, 274 A.2d 193, *cert. denied* (1971), 402 U.S. 974, 29 L. Ed. 2d 128, 91 S. Ct. 1665. See also *Woods v. State* (1954), 233 Ind. 320, 324-25 n.3, 119 N.E.2d 558, 561 n.3, *disapproved on other grounds* in *Ketcham v. State* (1959), 240 Ind. 107, 162 N.E.2d 247; Annot., 59 A.L.R.3d 569 (1974).

We noted in *People ex rel. Bier v. Scholz* (1979), 77 Ill. 2d 12, 19, and emphasize here that the public interest requires that the three branches in our system of government work cooperatively and in harmony. Consistent with this principle we reemphasize the necessity to exercise sparingly the inherent powers of the judiciary, and that deference should normally be accorded the governmental branch having initial responsibility. Under our statute the responsibility to provide judicial facilities rests on the county board. Section 26 of "An Act to revise the law in relation to counties" (Ill. Rev. Stat. 1979, ch. 34, par. 432) provides:

"It shall be the duty of the county board of each county:

First — To erect or otherwise provide when necessary, and the finances of the county will justify it, and keep in repair, a suitable court house ***.

* * *

Sixth — To provide proper rooms and offices, and for the repair thereof, for the accommodation of the circuit court of the county and for the clerks of such court, and to provide suitable furnishings for such rooms and offices \*\*\*. The court rooms and furnishings thereof shall meet with reasonable minimum standards prescribed by the Supreme Court of Illinois. Such standards shall be substantially the same as those generally accepted in court rooms as to general furnishings, arrangement of bench, tables and chairs, cleanliness, convenience to litigants, decorations, lighting and other such matters relating to the physical appearance of the court room.''

The statute establishes a mandatory duty (*People ex rel. Director of Finance v. YWCA* (1981), 86 Ill. 2d 219, 237; see also *People ex rel. Goodman v. Wabash R.R. Co.* (1946), 395 Ill. 520; *County of Mercer v. Wolff* (1908), 237 Ill. 74), and it is clear that the duty is as yet unperformed.

Plaintiff contends, however, that the administrative hearing conducted by defendant was unfair because defendant was an interested party. We are urged to disapprove this procedure. Both the Illinois Constitution and our own Rule 21 charge the chief judge of each judicial circuit with the responsibility of administering the circuit courts, subject to our supervisory power. (Ill. Const. 1970, art. VI, sec. 7(c); 73 Ill. 2d R. 21.) A competent chief judge will normally be the most knowledgeable person in his circuit regarding the needs and problems of the judiciary and the progress being made in resolving them. He is, in our judgment, particularly well qualified to evaluate the evidence presented in an administrative hearing held to determine whether judicial action to secure court facilities is warranted. To hold, as plaintiff urges, that his knowledge of this administrative subject matter disqualifies the chief judge from conducting the hearing is not, we believe, required in these circumstances. In order to ensure the availability of meaningful review, however, it is essential that any such administrative orders be entered only after a hearing of which adequate notice is given and at which all

interested parties are afforded an opportunity to present their views. We note parenthetically that our rules committee currently has under consideration the preparation of a rule establishing the procedure for such hearings and their review.

Although it is apparent from what we have said that defendant, as chief judge of the circuit, possessed the inherent power to enter, in appropriate circumstances, the order which he did, such power is to be exercised sparingly, as we earlier noted, and only in exigent circumstances. We are troubled here by the absence from this record of any explanation of the reasons for the collapse of the tentative agreement reached by defendant and the board a few days prior to the entry of defendant's order. Too, we recognize the serious difficulties inherent in the board's duty to provide adequate facilities from limited resources, and the record reflects that the county board was addressing both temporary and long-term proposals to meet the need for additional facilities. Also, only $2^{1/2}$ months elapsed between the time that the board was forced to postpone its finalized construction plans and defendant's entry of the order.

While the obvious lack of essential courtrooms and the problems resulting therefrom demand action, a proper regard for and deference to the prerogatives of the legislative and executive branches requires that judicial action be limited to exigent situations where the unwillingness of those branches to furnish essential facilities or personnel has been clearly established. For the reasons above outlined we were not entirely certain that there was no reasonable possibility of board action, and this opinion, which had been prepared, stayed the effect of defendant's order for an additional period of time. The desirability of extending the stay has since been reinforced by information furnished us indicating the board, on January 11, 1983, adopted a resolution for the creation of five temporary

courtrooms and authorizing implementation of the resolution.

In these circumstances we have determined to retain jurisdiction of this cause and continue in effect our order staying the effect of defendant's January 29, 1982, order for a further period of 120 days. If the board within that period secures defendant's approval of the plan and proceeds with its implementation, the writ of *mandamus* will issue. Otherwise, defendant's order, with any modifications further hearings establish as needed, shall become effective.

*Writ provisionally denied.*

JUSTICE MORAN took no part in the consideration or decision of this case.

JUSTICE SIMON, dissenting:

While this court's original decision to allow Mr. Knuepfer to file this unusual action was understandable at the time, I feel compelled to point out that the parties reached an agreement in this case a few months thereafter. The agreement provided for the 18th judicial circuit to receive substantially all of the additional court space it needed in the Du Page Center. This agreement was reached a few days before this court filed the opinion in this case, and we knew of the settlement before the filing date. I feel we should not have been so eager to issue and publish this opinion when nothing remained in controversy and in the face of the initial reluctance to decide the case which my colleagues themselves so clearly express (96 Ill. 2d at 287).

This case had its genesis in the rapid population growth of Du Page County, a situation of concern to the county's legislative and executive institutions as well as to its judiciary. While nothing in the record indicates that the space needs of the Du Page county board were expanding as rapidly in 1982 as those of the circuit court, it is fair to assume that in many cases the expansion of a county's court

system will be accompanied by a corresponding increase in the personnel or facilities which the county board will require; I am unwilling to exalt the former's needs over the latter's as unilaterally as the majority has done here. In this case the board made several offers of space which the circuit court rejected, apparently because of the time it would have required to reinforce the masonry of the part of the building in which the space was located. The majority makes no finding of bad faith on the part of the board, however, but merely finds that no court space was provided.

I feel that we as judges must be aware that the public purse is not bottomless and that needs of many agencies of government must be accommodated out of that purse. I believe that an administrative order compelling a county board to provide court space should be allowed to stand only when the circumstances of the particular case clearly and strongly warrant it and only if the board is financially able to comply with the order while performing its other fundamental obligations. To suggest that circuit courts have a general inherent power to issue and enforce such orders, whether justified by considerations of judicial efficiency, decorum or any other goal, is in my judgment to come dangerously close to sanctioning an imperial judiciary, a judiciary that is oblivious to the needs of other public agencies and the fiscal realities that are the everyday concern of those agencies, and particularly those such as county boards which are charged with the responsibility of appropriating and expending public funds.

Good government requires accommodation between its branches. A circuit court is not an independent fiefdom but is a part of government, like the county board. Its particular function is to administer justice to the many people who require the assistance of the courts, a function which is performed best if parties are encouraged to resolve as many controversies as possible outside of court. I question

whether the instant litigation, initiated by the circuit court itself against a co-equal branch of government, does not undermine this function by the example it presents, and whether it will not thereby continue to impede the functioning of government even after it is concluded. The majority opinion, far from resolving this problem, fosters its recurrence by acknowledging the authority of the judicial branch to provide by court order for full performance in cases such as this. This may encourage circuit courts to be adamant in presenting demands to county boards instead of attempting to compromise their needs and settle for the best accommodation possible under mutually agreeable terms. This is all the more regrettable because we did not have to issue an opinion in this case at all; we had the option of simply declaring the case moot (*Madison Park Bank v. Zagel* (1982), 91 Ill. 2d 231, 235-36; *In re Marriage of Wright* (1982), 89 Ill. 2d 498, 500) and trusting, as we should, that similar disagreements in the future will also be settled short of formal court proceedings.